**UNITED STATES of America, Appellee,**

v.

**Scott Richard SEELYE, Appellant.**

**No. 86–5234.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 8, 1986.

Decided March 27, 1987.

Douglas A. Myren, Minneapolis, Minn., for appellant.

Joseph T. Walbran, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and CONMY,[*] District Judge.

McMILLIAN, Circuit Judge.

Scott Richard Seelye appeals directly from a final judgment entered pursuant to a conditional guilty plea to the charge of felon in possession of a weapon in violation of 18 U.S.C.App. § 1202(a)(1). Seelye's guilty plea was conditioned on this appeal from an order of the District Court for the District of Minnesota[1] denying his pretrial motion to suppress, as the product of an illegal search, the weapon seized from him by a police officer. For reversal, Seelye argues the district court erred in concluding (1) that his detention by the police officer was an investigative stop and not an arrest and (2) that the handgun was lawfully seized from him in the frisk conducted pursuant to this detention under either characterization. For the reasons stated below, we affirm.

Officers Martinsen and Moen of the City of Minneapolis Police Department were on routine patrol on the evening of October 19, 1985. They received a radio dispatch that an anonymous informant had reported to police that a man in the hallway of an apartment building was pointing a gun at people as they left a party. The informant described the suspect as male, white or possibly Indian, with long, brown, braided hair and wearing a brown jacket. The officers responded to the call, but when they arrived at the apartment building they were unable to locate either the anonymous caller or the suspect. The officers then knocked on the door of apartment # 1, where it appeared a large party was going on. Georgianne Keller, the resident and hostess, told the officers that she had not heard anything about a man with a gun. Keller said, however, that a man matching the suspect's description had attempted to enter her party earlier, but that she had refused to let him in. She said she did not see a gun. The officers asked Keller to call the police if the man returned.

The officers received another radio dispatch about five minutes later. Keller had called to report that the suspect had returned to her party. The officers went back to the building and were met by Keller at her apartment door. She said the man was in her den and other people at the party confirmed that the suspect was present. According to the officers' testimony, Keller appeared anxious and frightened, but she did not mention seeing a gun.

Officer Martinsen entered the den and saw Seelye, who was standing with two or three other people, holding a cup of beer and smoking a cigarette. Seelye was not speaking to anyone nor was there a gun visible. Martinsen observed that Seelye had long, brown, braided hair and was wearing a brown suede jacket.

Martinsen drew his revolver and approached Seelye from behind, grabbing him by the collar of his jacket. Martinsen identified himself as a police officer and ordered Seelye to leave the apartment. The officer then led Seelye out of the apart-

---

[*] The Honorable Patrick A. Conmy, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

1. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota, presiding.

ment at gunpoint and into the main hallway of the building. In the hallway, Martinsen patted Seelye's midriff area and the waistband of his pants, but did not find a gun. The officer testified that he did not consider Seelye free to go at this point in time. Martinsen then ordered Seelye out of the building, explaining at trial that he thought there were too many people in the hallway to safely conduct a frisk. As they left the building, the officer instructed Seelye to place his hands behind him. Martinsen then removed Seelye's jacket from behind and felt a heavy object, which turned out to be a revolver, in one of the pockets.

Seelye was handcuffed, placed under formal arrest and confined in the rear of the squad car. Keller and two bystanders then approached Officers Martinsen and Moen and said that they had previously seen Seelye with a gun.

The threshold issue in this case is whether Seelye's initial detention by Officer Martinsen was an investigative stop or an arrest. Seelye does not challenge any of the district court's findings of fact, so this question is solely one of law.

■ The burden is on the state to demonstrate that the detention was sufficiently limited in scope and duration to satisfy the conditions of an investigative stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). To qualify as an investigative stop, a police officer's detention of a suspect must employ "the least intrusive means reasonably available to verify or dispel ... suspicion in a short amount of time." *Id.* If the force used exceeds these limits, an investigative stop is converted into an arrest. *United States v. Jones*, 759 F.2d 633, 636 (8th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985) (*Jones*).

■ Applying the "least intrusive means" standard to the facts of a case requires that we balance the competing interests of the police officer against those of the private individual. In general, a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time. *Id.* at 636–37 (citation omitted). A number of factors are used to determine whether the amount and kind of force used was reasonable and consistent with an investigative stop. These include: (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances. *Id.* at 639–40.

Seelye argues that he was under arrest from the time Officer Martinsen grabbed him from behind at the party and, at gunpoint, ordered him to leave the apartment. Seelye contends the force used by the officer elevates what may have been intended to be merely an investigative stop to an arrest. The government contends the force used by Officer Martinsen to remove Seelye from the apartment was reasonable under the circumstances for an investigative stop. The government argues that the officer was concerned for his own safety and for the safety of bystanders in the building. Further, the officer had a reliable suspicion that Seelye was armed, which justified his use of a weapon. The government points out that a police officer's display of a weapon does not, alone, convert an investigative stop into an arrest. *See id.* at 639–40.

■ We conclude that the police officer's use of force in physically restraining and ordering Seelye out of the apartment at gunpoint did not exceed the amount of force appropriate to an investigative stop. Officer Martinsen was confronting a potentially dangerous man in a crowded party setting. He testified that his training and experience led him to believe that it would be safer to frisk and, if necessary, to disarm Seelye away from a large group of people. Given these specific circumstanc-

es, we find the amount of force used was appropriate for an investigative stop.

Based on this conclusion, we will analyze whether the officer's seizure and subsequent frisk of Seelye was constitutionally justified under the standards that govern an investigative stop and frisk. An investigative stop must be supported by "a reasonable articulable suspicion" that a crime is being or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). At the time Officer Martinsen initially detained and frisked Seelye, he was acting on two interlocking police reports of a suspect fitting a certain description. The officer and his partner first responded to an anonymous tip of a man with a gun, which included a detailed description of the suspect. They spoke to Keller, who corroborated details of the tip, confirming that a man matching the suspect's description had been hanging around her party. When the officers were summoned back to Keller's apartment a few minutes later, they were told by Keller and several other guests that a man matching the suspect's description was present. On entering the den, Officer Martinsen confirmed that Seelye's appearance closely matched the description given. In *United States v. McBride*, 801 F.2d 1045 (8th Cir.1986), this court quoted with approval a decision of the Sixth Circuit, *United States v. Andrews*, 600 F.2d 563, 569–70 (6th Cir.) (citations omitted), *cert. denied*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979), where it was held that information from an unknown informant, if sufficiently detailed and corroborated, will justify an investigative stop. In the present case, the detailed description given by the anonymous informant was corroborated by Keller and other partygoers, and by the police officer himself. The detailed description corroborated by observation provided a sufficient basis for a reasonable suspicion justifying Officer Martinsen's investigatory stop and frisk of Seelye.

Accordingly, we hold that the district court did not err in denying the motion to suppress the handgun seized from Seelye by the police officer. We therefore affirm the judgment of the district court.