**UNITED STATES of America, Appellee,**

v.

**Douglas Wayne THOMPSON, Appellant.**

**No. 89–5226.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 11, 1989.

Decided July 5, 1990.

Deborah Ellis, St. Paul, Minn., for appellant.

Joseph T. Walbran, Minneapolis, Minn., for appellee.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Douglas Wayne Thompson (appellant) pleaded guilty to aiding and abetting a robbery, conspiracy to commit bank robbery, possession of a firearm during a crime of violence, and interstate transportation of a firearm. For reversal of his conviction, appellant argues the district court[1] erred in (1) denying his motion to suppress evidence seized in violation of the fourth amendment and (2) denying his motions to withdraw his guilty plea. We affirm.

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

## FACTS

On September 19, 1988, appellant was stopped by police on Interstate 94 approximately seven blocks west of the Battle Creek Bank in St. Paul, Minnesota. Appellant was a passenger in an automobile driven by Daniel Wilwerding. Earlier that day the Kansas City, Missouri, Police Department (KCMPD) received a telephone call from informant Maxine Janette Czirr who had previously provided the police with several tips regarding appellant.[2] Ms. Czirr informed Detective Luther that appellant and his year-long associate whom she identified as "Dan" were on their way to the Twin Cities to rob the First Bank of Minnesota, the Battle Creek Bank and "TFC."[3] Ms. Czirr said that the two men had cased the banks during the prior week and chosen them because of their proximity to a freeway for easy get-away.[4] Ms. Czirr told Detective Luther that the suspects would be driving a late model silver and blue Lincoln Continental with California license plates. She said the two men were armed with three large caliber handguns, including a chrome-plated long barrel .357 caliber revolver. Detective Luther knew appellant was a white male, 5'9" tall, 178 pounds, greying hair, slightly bald, born on October 18, 1933, a/k/a David White. Ms. Czirr described "Dan" as a white male between the ages of 36 and 38 with short, dark brown hair, an olive complexion and appearing to be of Italian descent. She said he was approximately six feet tall and weighed 170 pounds. Ms. Czirr said that appellant had been staying with her for approximately ten days prior to his departure for Minnesota on September 18, 1988. She stated that appellant was with her the night before he departed and that on September 18 she drove him to the house of an individual known by police to be involved in local organized crime where they met up with Dan.

Detective Luther immediately relayed the tip to the FBI in Kansas City who in turn notified the FBI in Minneapolis. The Minneapolis FBI notified the St. Paul Police Department which issued an all-points bulletin about the possible bank robberies and a description of the suspects.

Around noon on September 19, 1988, just hours after Ms. Czirr first contacted the police, St. Paul Police Officer Richard Schmidt observed a car which he believed to contain the suspects one block from the Battle Creek Bank. The car was a late model black and blue Lincoln Continental. Officer Schmidt followed the car in a westerly direction away from the bank on Interstate 94 and noticed that the license plates were from New Jersey not California. He pulled the car over and was joined by Sergeant Terry Trooien. The officers approached the car and began questioning the suspects. The driver identified himself as Joseph Daniel White and appellant identified himself as Robert Wayne Jennings. When asked what brought them to Minnesota, the driver of the vehicle replied they were salesmen passing through the state. The driver produced a New Jersey driver's license in the name of Joseph D. White that indicated he was born in 1943. Appellant produced a New Mexico driver's license in the name of Robert W. Jennings that indicated a 1933 birthdate. The car was registered to Joseph White.

The two officers stepped away from the Lincoln Continental to check the driver's licenses and confer. The radio check revealed nothing suspicious. The officers noted that the driver did not match the informant's description in every respect. For instance, his driver's license indicated he was over forty years of age. The officers also noted, however, that he identified himself as Joseph "Daniel" White and that he appeared to be of Italian extraction.

---

**2.** Appellant had been a target of the Career Criminal Unit of the KCMPD since 1987, and was at the time of his arrest wanted for a probation violation in connection with the murder of a police officer.

**3.** Ms. Czirr probably meant "TCF" or Twin City Federal.

**4.** After appellant and Wilwerding were arrested, Ms. Czirr admitted that she had cased the banks with appellant one week before the attempted robbery.

Meanwhile, several squad cars arrived at the scene. The officers decided to order the two men out of the car, frisk them for weapons, and place them in separate squad cars. After doing so, the officers searched the interior of the vehicle and its trunk and found in a briefcase on the back seat two loaded pistols, a .357 caliber revolver and a .38 caliber revolver. Police also found a police scanner,[5] a list of radio frequencies for the Twin Cities area, pages from a telephone directory listing banks in the area, sketches of locks and various disguises. The highway stop and search lasted a total of approximately one and one-half hours.

Appellant and the driver of the vehicle, who was later identified as Daniel Wilwerding, were arrested and charged in an indictment for various crimes including conspiracy to commit bank robbery. A joint trial of both defendants was set for January 3 or 4, 1989. Both defendants filed motions to suppress the evidence obtained from the search of their vehicle. After a hearing, their motions were denied.

On December 30, 1988, Wilwerding pleaded guilty and agreed to testify against appellant. His testimony would have implicated appellant in the Battle Creek Bank robbery attempt, in a previously indicted robbery of the United Postal Savings Association in Kansas City on July 5, 1988, and three other robberies in Kansas City. Reserving his right to appeal the denial of his motion to suppress, appellant agreed to plead guilty to robbing the United Postal Savings Association in Kansas City, a charge which was transferred to the District of Minnesota pursuant to Fed.R.Civ.P. 20, and to three of the four charges in the Minnesota indictment.[6] His plea was entered on January 4, 1989.

Three weeks after entering his guilty plea and before sentencing, appellant filed a *pro se* motion to withdraw his plea. As grounds for withdrawal, appellant alleged ineffective assistance of counsel. Specifically, he alleged that his counsel failed to tell him about Wilwerding's testimony about the Kansas City robberies and failed to investigate the truth of this testimony. Appellant claims he has evidence that he was not involved in these other robberies. In a supplemental motion, appellant alleged that the government falsely accused appellant of a June 28, 1988, bank robbery in Milwaukee in order to induce a guilty plea. The district court denied both motions and sentenced appellant to a total of twenty years imprisonment, three years supervised release and a $200 special assessment. This appeal followed.

## MOTION TO SUPPRESS

■ Appellant argues that the police did not have reasonable suspicion to stop the automobile in which he was riding or probable cause to make an arrest and search the vehicle. We disagree.

■ In order to make an investigatory stop, police must have a reasonable and articulable suspicion that a crime has been or is being committed and need not possess the probable cause necessary to make a full arrest. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Reasonable suspicion may be based on an informant's tip as long as it is sufficiently reliable. *See Alabama v. White*, —— U.S. ——, ——, 110 S.Ct. 2412, 2414–2415, 110 L.Ed.2d 301 (1990) (anonymous tip corroborated by independent police work); *Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972) (informer known personally to officer and had provided officer with information in the

---

**5.** Officer Schmidt testified at the suppression hearing that he noticed the police scanner in the front seat before he ordered the men out of the car. Police scanners are illegal in Minnesota. Minn.Stat.Ann. § 299C.37 (West Supp.1990). Appellant and Wilwerding testified that the scanner was underneath the front seat and not in plain view. The district court did not resolve this factual dispute, holding instead that the police had probable cause to arrest the occu-

pants of the vehicle without knowledge of the scanner.

**6.** Appellant plead guilty to conspiracy to commit bank robbery, possession of a firearm during a crime of violence and interstate transportation of a firearm. The indictment also charged appellant with being a felon in possession of a firearm, but the charge was dismissed in exchange for appellant's plea.

past); *United States v. McBride*, 801 F.2d 1045, 1046–48 (8th Cir.1986) (anonymous tip), *cert. denied*, 479 U.S. 1100, 107 S.Ct. 1325, 94 L.Ed.2d 177 (1987).

We hold that Ms. Czirr's telephone call to the police on the morning of September 19, 1988, was sufficiently reliable to form the basis of Officer's Schmidt's suspicion that a crime was about to be or had been committed by the two occupants of the Lincoln Continental.[7] Ms. Czirr had been supplying the KCMPD with information about appellant since June 1987. Some of the information she supplied had been corroborated by the police. For instance, Ms. Czirr told Detective Luther that she once accompanied appellant under the alias of David White to Albert Lea, Minnesota, where he intended to commit a robbery. Detective Luther confirmed that a man by the name of David White had registered in a motel in Albert Lea on the dates specified by Ms. Czirr. Detective Luther also verified that Douglas Wayne Thompson and David White were indeed the same person by matching their fingerprints. In addition, Detective Luther was able to verify Ms. Czirr's tip that appellant associated with a known organized crime figure in Kansas City. Furthermore, Ms. Czirr's tip on September 19, 1988, described in detail the names of the banks, the specific weapons in appellant's possession, the time and date of the robberies, and the manner in which appellant planned on robbing the bank.

▆ The informant's tip was substantially corroborated when Officer Schmidt saw two men in a late model black and blue Lincoln Continental just one block from the Battle Creek Bank around noon on September 19, 1988. That the car was not the exact color described by the informant and carried New Jersey license plates rather than California plates did not destroy Officer Schmidt's reasonable suspicion that the vehicle he observed was the same vehicle described in the all-points bulletin.[8]

▆ We turn now to the events following the stop, namely appellant's arrest and the search of the vehicle. As a threshold matter, we agree with the district court that placing appellant in the squad car constituted an arrest. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (even in the absence of a formal arrest, probable cause may be required when detention is indistinguishable from a formal arrest). Six factors guide us in determining whether the amount of force used during an investigatory stop constitutes an arrest for purposes of a fourth amendment analysis:

(1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

*United States v. Seelye*, 815 F.2d 48, 50 (8th Cir.1987) (*Seelye*). In *Seelye*, we decided that physically restraining the defendant and ordering him out of an apartment at gunpoint did not exceed the amount of force appropriate to an investigatory stop because the officer confronted a potentially dangerous man in a crowded party and believed it would be safer to frisk and disarm him away from a large group of people. *Id.* at 50. Each case must be decided on its own unique set of facts, however, and the same factors that guided us in *Seelye* lead us to a different conclusion in this case.

---

7. Although the tip was received by KCMPD Detective Luther, Officer Schmidt was entitled to rely on the information transmitted over the all-points bulletin as long as the originator of the radio bulletin had reasonable suspicion to believe a crime would be or had been committed. *See United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985).

8. We note that both New Jersey and California have blue and yellow license plates, although New Jersey's are paler blue.

We hold that placing the suspects in separate squad cars was not within the scope of a *Terry*-type stop, and therefore constituted an arrest. Although police had reason to believe that the suspects were carrying weapons, there were approximately seven squad cars present by the time the suspects were taken from their vehicle. In addition, neither suspect had made any movement that would indicate he might open fire on the officers. The two officers who made the stop evidently did not believe they needed to take any immediate action to protect themselves from the suspects because they took no such precaution when they stepped away from the suspects' vehicle to check their driver's licenses and car registration. *Cf. United States v. Lego,* 855 F.2d 542, 545 (8th Cir.1988) (officer thought it safe to place suspect in squad car while she checked for outstanding warrants after suspect approached her with his hands in his pockets and after a frisk revealed a knife in his pocket). We also note that the entire encounter lasted for approximately one and one-half hours and that the two men were photographed at the scene of the stop. Lastly, while not dispositive of this issue, the officer who pulled appellant from the car characterized his action as an arrest at the suppression hearing.

Having concluded that an arrest took place at the scene of the stop, we must determine whether the police had probable cause to make the arrest without a warrant. *United States v. Watson,* 423 U.S. 411, 417–18, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598 (1976). We conclude that, based on the informant's tip which was corroborated and supplemented by the officers' own observations, the officers had probable cause to arrest the suspects. *See Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Ramos,* 818 F.2d 1392 (8th Cir. 1987); *United States v. McGauley,* 786 F.2d 888 (8th Cir.1986). This is a case where both the reliability of the informant and her basis of knowledge were known to the officers. The informant had established her reliability by previously supplying information which turned out to be true. Appellant had stayed with the infor-

mant prior to the incident in question and she had driven him to meet "Dan" on the day appellant and Dan left for the Twin Cities. Furthermore, her tip was corroborated at the scene of the stop. Appellant matched the informant's description of him and his driver's license indicated he was born in 1933. Although the driver of the vehicle was older and shorter than his description, the officers did notice that his middle name was "Daniel." The car generally matched the description given by the informant and was in the predicted Twin Cities area just one block from one of the targeted banks on the afternoon of September 19, 1988. In addition, the officers did not see anything in the car that would substantiate the suspects' assertion that they were salesmen passing through Minnesota such as kits, brochures or invoices. The officers also testified that the photographs on the suspects' driver's licenses looked "rough," perhaps indicating false identification, and when Officer Schmidt first observed the automobile he noticed that appellant glanced at the squad car in what Officer Schmidt believed was a suspicious manner. Under the totality of the circumstances known to the officers at the time of the arrest, we are convinced the officers had probable cause to believe that appellant was engaged in criminal activity. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

■ Finally, we address appellant's argument, mentioned but not elaborated on in his brief, that the search of the vehicle was an unlawful search under the fourth amendment. Because we have held that the arrest of the suspects at the scene of the stop was valid, this argument needs little discussion. In *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (*Belton* ), the Supreme Court significantly broadened the scope of a search of a vehicle incident to a lawful arrest of the vehicle's occupant. The permissible scope of such a search now includes the "passenger compartment" and any containers found therein. *Id.* at 462, 101 S.Ct. at 2865; *United States v. Garcia,* 785 F.2d 214, 225 (8th Cir.), *cert. denied,* 475 U.S.

1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986) (*Garcia*). "Passenger compartment" has been interpreted broadly by most courts following the Supreme Court's decision in *Belton* and generally includes whatever area is within a passenger's reach. *E.g.*, *United States v. Pino*, 855 F.2d 357, 364 (6th Cir.1988) (rear section of a mid-size station wagon), *cert. denied*, — U.S. —, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990); *Garcia*, 785 F.2d at 225 (referring generally to the interior of the automobile); *United States v. Russell*, 670 F.2d 323, 327 (D.C.Cir.), (hatchback), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d 1317 (1982). That the weapons were found in a briefcase on the back seat of the vehicle does not therefore alter our conclusion that the search was lawful because the back seat of the Lincoln Continental and the briefcase found lying on the seat were within the scope of a search incident to arrest.

The trunk of the vehicle, in which was found a false mustache and other disguises, however, is not within the scope of a search incident to arrest. *See Belton*, 453 U.S. at 460 n. 4, 462, 101 S.Ct. at 2864 n. 4, 2865 (holding encompasses only the passenger compartment and not the trunk of the automobile). The warrantless search of the trunk may, however, be justified under the automobile exception to the warrant requirement if the police had probable cause to believe the vehicle contained the fruits or instrumentalities of a crime. *Chambers v. Maroney*, 399 U.S. 42, 47–48, 90 S.Ct. 1975, 1979–80, 26 L.Ed.2d 419 (1970); *United States v. Burns*, 684 F.2d 1066, 1074 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); *see United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982) (scope of warrantless search of automobile includes area which would have been covered had a warrant been issued). We have no trouble finding probable cause to search the trunk of the vehicle for evidence of criminal activity, particularly after the search of its interior further corroborated the informant's tip that appellant and his companion were traveling to the Twin Cities to rob a bank.

In sum, the district court did not err in denying appellant's motion to suppress evidence obtained as a result of the investigatory stop of the vehicle in which he was riding, his arrest, and the subsequent search of the vehicle. Each was supported by the necessary level of suspicion about appellant's illegal activities and therefore did not violate the fourth amendment.

## MOTION TO WITHDRAW GUILTY PLEA

Appellant argues that the district court erred in denying his *pro se* motions to withdraw his guilty plea. Appellant argues that the district court abused its discretion by failing to conduct an evidentiary hearing on his assertion of ineffective assistance of counsel and that his plea was not entered voluntarily or knowingly. He also argues that his plea was coerced by the government's threat to introduce testimony about his participation in a bank robbery in Milwaukee, testimony which he claims the government knew was false.

A motion to withdraw a plea of guilty which is made before sentencing may be granted upon a showing by the defendant of any fair and just reason. Fed.R.Crim.P. 32(d). The burden of establishing a fair and just reason is on the defendant. *United States v. Dixon*, 784 F.2d 855, 856 (8th Cir.1986). A district court's refusal to grant such a motion is reviewed under the abuse of discretion standard. *United States v. Moore*, 822 F.2d 35, 37 (8th Cir.1987); *United States v. Boyd*, 610 F.2d 521, 524 (8th Cir.1979), *cert. denied*, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980). While the "fair and just" standard is a liberal one, we are mindful that "[t]he plea of guilty is a solemn act not to be disregarded because of belated misgivings about the wisdom of the same." *United States v. Woosley*, 440 F.2d 1280, 1281 (8th Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 53, 30 L.Ed.2d 108 (1971); *see Blackledge v. Allison*, 431 U.S. 63, 73–74, 97 S.Ct. 1621, 1628–29, 52 L.Ed.2d 136 (1977).

We hold that the district court did not abuse its discretion when it denied appellant's motions without conducting an ev-

identiary hearing. A court entertaining a motion to withdraw a guilty plea need not hold an evidentiary hearing if the allegations in the motion are inherently unreliable, are not supported by specific facts or are not grounds for withdrawal even if true. *United States v. Fountain*, 777 F.2d 351, 358 (7th Cir.1985), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1232, 89 L.Ed.2d 341 (1986); *United States v. Johnson*, 751 F.2d 291, 294 (8th Cir.1984) (collateral attack on guilty plea), *cert. denied*, 471 U.S. 1126, 105 S.Ct. 2659, 86 L.Ed.2d 275 (1985); *see United States v. Stitzer*, 785 F.2d 1506, 1514 (11th Cir.) (no evidentiary hearing required in light of extensive inquiries by trial court before accepting plea), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986).

In his motions, appellant alleged that his counsel was ineffective for failing to disclose to appellant the precise nature of his codefendant's testimony. Appellant argues that he did not learn until the day the plea was entered that Wilwerding had agreed to testify about appellant's involvement in four Kansas City robberies. Appellant asserts that this testimony would have been false, could easily have been impeached and furthermore might have been inadmissible under Fed.R.Evid. 404(b). Appellant argues that his counsel's advice to plead guilty was premised on the erroneous assumption that Wilwerding's testimony regarding the other robberies was true and admissible.

The district court explored some of appellant's allegations at the sentencing hearing. The district court found that at the time appellant entered into the plea agreement on January 3, 1989,[9] neither he *nor* his counsel knew of Wilwerding's testimony implicating him in the four Kansas City robberies. Therefore, his counsel's advice to plead guilty could not have been based on this particular aspect of Wilwerding's testimony. On January 4, 1989, after he was told the full extent of Wilwerding's testimony, appellant did not indicate a desire to withdraw from the plea agreement and the plea was formally entered after extensive questioning from the district court indicating appellant's full knowledge of the consequences of pleading guilty and of his options. Among other things, the district court expressly advised appellant of his right to use the court's subpoena power to call witnesses on his behalf. According to the government, appellant had caused subpoenas to issue to friends in Kansas City before he decided to plead guilty. Therefore, his argument that his counsel was ineffective for failing to investigate potential alibi witnesses to the Kansas City robberies is without merit. Finally, appellant indicated he was satisfied with counsel's representation.

The district court did not specifically address appellant's allegation that the government threatened to introduce evidence of his involvement in a Milwaukee bank robbery knowing the evidence to be false. The government asserts that while it initially thought appellant was involved in the Milwaukee robbery, it discovered he was not involved *before* the plea agreement was reached and informed appellant's counsel that it would not seek to introduce evidence of the Milwaukee robbery against appellant. The record does not indicate that appellant was coerced in any way by this evidence, and to the contrary indicates that his plea was based on Wilwerding's testimony implicating him in the Minnesota robbery attempt and the Kansas City robbery of the United Postal Savings Association.

Appellant failed to convince the district court of any impropriety surrounding his plea agreement and we are likewise unconvinced. We agree with the district court that appellant's complaints have no bearing on the legitimacy of the charges to which he pled. A careful review of the plea transcript indicates that appellant's plea was entered knowingly, voluntarily and after adequate representation by counsel. The district court did not abuse its discretion in denying his motions to withdraw the plea.

9. According to the government, appellant first agreed to plead guilty on Saturday, December 31, 1988.

Accordingly, we affirm the judgment of the district court.