UNITED STATES of America, Appellee,

v.

Corey WILLIS, Appellant.

No. 91–2467.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 4, 1991.

Decided June 26, 1992.

Rehearing and Rehearing En Banc
Denied Aug. 10, 1992.

---

George H. Smith, Minneapolis, Minn., argued, for appellant.

Jeffrey S. Paulsen, Asst. U.S. Atty., Minneapolis, Minn., argued (Judy L. Hallett, Asst. U.S. Atty., on the brief), for appellee.

Before LAY, Chief Judge,* HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

LOKEN, Circuit Judge.

Corey Willis appeals his conviction for drug and weapon offenses in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c). He argues that the district court[1] erred in denying his motion to suppress evidence, in denying his motion for judgment of acquittal, and in rejecting the contention that his more severe sentence for possession with intent to distribute cocaine base (crack cocaine), as opposed to cocaine powder, violates his Fifth Amendment right to equal protection. We affirm.

## I.

At around 3:00 a.m. on Halloween morning, 1990, Brooklyn Park police received a phone call from a cab driver parked at a service station who was encountering "unknown problems." Two officers in separate vehicles responded to the call. Officer Brad Pearson pulled into the station where the cab was parked to speak with the driver. Pearson learned that the cab driver had called because he was afraid of being robbed but that no robbery had occurred.

Sergeant Kampa approached the station in the second car and saw Willis and his companion walking away. As Kampa drove past the station, Willis trotted across the street with a shopping bag in hand, cutting in front of Kampa's car. When Willis saw the police car his pace quickened from a slow run to an all-out sprint. Kampa followed Willis but lost him in the parking lot of a White Castle restaurant. Kampa found Willis's shopping bag lying in the parking lot, picked it up, and locked it in his car.

Officer Steve Pearson arrived next with a police dog. As Pearson waited in the parking lot, Kampa climbed to the roof of the White Castle where he saw Willis hiding behind a roof vent. Kampa radioed Steve Pearson that he had found Willis and, with his gun drawn, ordered Willis three times to come out of hiding. Willis finally left his hiding place, ran across the roof, and swung one leg over the side of the building as if to jump off and continue his flight. He was met by Steve Pearson and his barking dog and was ordered to "stop and stay where he was." Kampa repeated Pearson's command and Willis stopped, pulled his leg back onto the roof, and stood with his hands up against a stub wall.

Kampa then radioed for support, and Brad Pearson joined him on the roof. Brad Pearson and Kampa approached Willis and patted him down to check for weapons. Brad Pearson then told Kampa that Willis had not done anything to the cab driver, which prompted Kampa to ask Willis why he had fled. Willis answered that there was a gun in his bag and an outstanding warrant for his arrest. Kampa verified the warrant and placed Willis under arrest. The officers then instructed Willis to climb down from the roof and lie on the ground, where a fourth officer handcuffed Willis and searched him, finding a pager and $410.00 in cash.

Sergeant Kampa then returned to his car and looked in the shopping bag where he found a loaded .38 caliber revolver and a plastic bag filled with what appeared to be a large amount of crack cocaine. Willis was taken to the Brooklyn Park Police Department where he was given a *Miranda* warning and made a statement. A warrant was obtained to search Willis's residence, where police found another loaded .38 caliber revolver, an electronic gram scale, $119.00 in cash, and a small amount of crack cocaine.

Before trial, the district court denied Willis's motion to suppress all the seized evidence. The jury convicted Willis of possession with intent to distribute approximately

---

* The HONORABLE DONALD P. LAY was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status January 7, 1992, before the opinion was filed.

1. The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota.

200 grams of cocaine base, and of using a firearm during a drug trafficking crime. He was sentenced to 188 months in prison on the drug count, an additional five years in prison on the firearm count, and five years of supervised release. This appeal followed.

## II.

Willis first argues that the district court erred when it denied his motion to suppress the evidence found in the shopping bag, the evidence seized when he was arrested, and the evidence seized during the subsequent search of his residence. Willis contends that the police pursued him and seized the shopping bag with no reasonable, articulable suspicion that criminal activity may be afoot, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that any permissible *Terry* stop escalated into an arrest without probable cause on the White Castle roof. We review questions of seizure *de novo. See United States v. McKines,* 933 F.2d 1412, 1424 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). We agree with the district court's analysis of the Fourth Amendment issues raised by this encounter.

■ 1. Willis was not seized at the point during his flight from Sergeant Kampa when he dropped the shopping bag in the parking lot. As Willis conceded at oral argument, this aspect of the district court's ruling is now beyond dispute:

> In sum, assuming that Pertoso's pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.

*California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991).

The district court found that Willis abandoned the shopping bag and therefore concluded that Kampa did not violate Willis's Fourth Amendment rights by retrieving the bag and looking inside. We review this finding under the clearly erroneous standard. *See United States v. Ruiz,* 935 F.2d 982, 984 (8th Cir.1991). As numerous cases make clear, the finding that Willis intended to abandon a bag containing crack cocaine and a loaded firearm with police in hot pursuit is anything but clearly erroneous. *See, e.g., United States v. Koessel,* 706 F.2d 271, 274 (8th Cir.1983). Willis's motion to suppress the shopping bag's contents was properly denied.

■ 2. Sergeant Kampa had reasonable suspicion to pursue the fleeing Willis and to make a *Terry* investigative stop. The officers were responding to a late-night call for assistance from the taxicab driver. As Kampa arrived, and before he learned that nothing had happened to the driver, he observed Willis leaving the scene. Willis began to flee when he realized that police had arrived; he then dumped his shopping bag and hid on a roof.

The district court's finding of reasonable suspicion will not be reversed unless clearly erroneous. *See United States v. Peoples,* 925 F.2d 1082, 1085 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). In these circumstances, if Kampa had known that a crime had been committed, Willis's flight would have provided probable cause to arrest. *See Sibron v. New York,* 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968) ("deliberatively furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*"). Because the cab driver's call for assistance suggested that late-night criminal activity might be afoot, Willis's conduct in fleeing and dropping the bag provided Kampa with the reasonable suspicion that warrants a *Terry* investigative stop. *Compare Peoples,* 925 F.2d at 1086; *United States v. Turpin,* 920 F.2d 1377, 1385 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991); *United States v. Lane,* 909 F.2d 895, 899 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 977, 112 L.Ed.2d 977 (1991); *United States v. Espinosa,* 827 F.2d 604, 608 (9th Cir.1987), *cert. denied,* 485 U.S. 968, 108 S.Ct. 1243, 99

L.Ed.2d 441 (1988); *United States v. Jones,* 759 F.2d 633, 643 (8th Cir.), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985).

■ Willis argues that, when Kampa learned Willis had not done anything to the cab driver, Kampa went beyond a reasonable investigative stop by questioning him. However, Willis had behaved suspiciously in fleeing, dropping the shopping bag, and refusing to come out of hiding on the roof. Having properly stopped Willis, Kampa was justified in asking him to explain his actions even though the initially suspected crime had apparently not occurred. *See Jones,* 759 F.2d at 643; *United States v. Beardslee,* 609 F.2d 914, 918 (8th Cir.1979), *cert. denied,* 444 U.S. 1090, 100 S.Ct. 1053, 62 L.Ed.2d 778 (1980) ("[a]lthough the detectives received a radio broadcast to the effect that no bank robbery or attempted bank robbery had taken place, this did not detract from the possibility that criminal activity had taken place").

■ 3. When the police caught up with Willis on the White Castle roof, he was seized when he complied with Sergeant Kampa's order to stop and put his hands on the roof wall. *See Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (a person is seized "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). Willis argues that this seizure went beyond a *Terry* investigative stop and became an arrest without the constitutionally requisite probable cause. We disagree.

There is no bright line test to determine when police conduct exceeds the bounds of an investigative stop:

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case.... [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983).

■■ Here, the fact that Sergeant Kampa brandished his gun to make Willis stop was reasonable under the circumstances and did not transform the stop into an arrest. *See Jones,* 759 F.2d at 638. Likewise, the decision to pat Willis down for weapons was a reasonable measure for the protection of the police officers and did not convert the stop into an arrest. *See Terry,* 392 U.S. at 26–27, 88 S.Ct. at 1882–83; *United States v. Abokhai,* 829 F.2d 666, 670 (8th Cir.1987), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1082, 99 L.Ed.2d 241 (1988). Willis was briefly questioned at the same location where he was stopped to verify or dispel the officers' suspicions. Before learning of the outstanding arrest warrant, the officers did not subject Willis to any unnecessary delays, handcuff him, or confine him in a police car, but instead they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). We agree with the district court that the police officers' actions were "reasonably necessary to protect [their] personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling [their] suspicion." *United States v. Seelye,* 815 F.2d 48, 50 (8th Cir.1987).

■■ 4. In response to Kampa's brief questioning, which was proper under *Terry,* Willis admitted he had a gun in his bag and there was an outstanding warrant for his arrest. The police verified the outstanding warrant and placed Willis under arrest. The warrant provided probable cause for the arrest, and the arrest justified the further search of Willis's person which produced the pager and cash later admitted into evidence at trial. The lawful arrest and seizures also provided probable cause for the warrant subsequently issued to search Willis's residence, so that the items seized pursuant to that warrant were also properly admitted at trial. *See United*

*States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973).

### III.

Willis argues that the district court erred when it denied his Rule 29 motion for judgment of acquittal. In reviewing that ruling, we must give the government the benefit of all reasonable inferences drawn from evidence considered in the light most favorable to the government. *See United States v. Barragan,* 915 F.2d 1174, 1177 (8th Cir.1990).

The government presented evidence that Willis possessed 200 grams of crack cocaine as well as a gun, gram scale, pager and substantial amounts of cash. This was sufficient evidence to prove Willis's intent to distribute crack cocaine. *See United States v. Knox,* 888 F.2d 585, 588 (8th Cir.1989). Willis attempted to refute the evidence by blaming his companion. However, the jury found the government's evidence more persuasive. After a careful review of the record, we conclude that the evidence was clearly sufficient to support the jury's verdict and thus the motion for judgment of acquittal was properly denied.

### IV.

Finally, Willis argues that the more severe sentence he received under the Guidelines for possession with intent to distribute crack cocaine, as opposed to cocaine powder, violated his Fifth Amendment right to equal protection.[2] Relying upon Hennepin County (Minneapolis) statistics, Willis asserts that the higher penalties for crack have a racially discriminatory impact because blacks account for 100% of those sentenced for possession of crack, but only 27% of those sentenced for possession of cocaine powder.

In *United States v. Buckner,* 894 F.2d 975, 980 (8th Cir.1990), we rejected a substantive due process challenge to the "100

to 1 ratio" used by the Sentencing Commission in delineating the guideline ranges for crack cocaine and cocaine powder. After noting that this ratio was mandated by Congress in 21 U.S.C. § 841(b), we reviewed the 1986 legislative history in detail. *See* 894 F.2d at 978–79 nn. 9 & 10. We concluded that Congress had a rational basis, in terms of protecting society, for imposing more severe penalties for crimes involving crack cocaine "because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence." 894 F.2d at 978.

Since *Buckner,* we have on three occasions rejected equal protection challenges to this portion of the Guidelines and their statutory authority that were based upon the alleged racially discriminatory impact of the more severe crack penalties. *See United States v. Simmons,* 964 F.2d 763, 767 (8th Cir.1992); *United States v. Johnson,* 944 F.2d 396, 404 n. 7 (8th Cir.), *cert. denied,* 112 S.Ct. 646, 116 L.Ed.2d 663 (1991); *United States v. House,* 939 F.2d 659, 664 (8th Cir.1991). Willis has presented no evidence that Congress enacted the more severe crack penalties, or allowed them to remain in effect, "to further a racially discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 298, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262 (1987). Therefore, the rational basis analysis of *Buckner,* as followed in *Simmons, Johnson,* and *House,* requires us to reject Willis's equal protection argument.

Willis urges us instead to follow a recent decision of the Minnesota Supreme Court holding that a state statute imposing more severe penalties for possession of crack cocaine violated the equal protection clause of the Minnesota Constitution. *See State v. Russell,* 477 N.W.2d 886 (Minn.1991). However, in *Russell* the Minnesota Supreme Court interpreted only the state equal protection clause, applying what it termed a "less deferential" rational basis standard under state law. 477 N.W.2d at

---

**2.** Under the Guidelines, Willis's criminal history placed him in category III, so that his guideline range for possession with intent to distribute 200 grams of crack cocaine was 188 to 235

months. His range for possession with intent to distribute that quantity of cocaine powder would have been 41 to 51 months. *See* U.S.S.G. §§ 2D1.1(c)(5), (12), ch. 5, Pt. A.

889. In addition, the legislative history of the Minnesota statute, as recited in the *Russell* opinion, offered much less in the way of a rational basis for that statute than did the history of the federal law that we summarized in *Buckner*. Accordingly, *Russell* does not cause us to believe that we should reconsider our controlling decisions in *Simmons, Johnson,* and *House,* a step which could only be taken by the court en banc.

For the foregoing reasons, the judgment of the district court is affirmed.

HEANEY, Senior Circuit Judge, with whom LAY, Senior Circuit Judge, joins, concurring.

I concur in the court's opinion, but only because I am bound by our prior decisions that hold there is no merit in Willis' equal protection argument. Neither this record nor the ones on prior occasions support the view that Congress had a sound basis to make the harsh distinction between powder and crack cocaine. Although the 1986 Congressional hearing with respect to crack cocaine cited by our court in *Buckner* was filled with general statements about the dangers of crack and the economics of crack distribution, Congress had no hard evidence before it to support the contention that crack is 100 times more potent or dangerous than powder cocaine. More recently, drug researchers have concluded that the short-term and long-term effects of crack and powder cocaine are identical. *See* David Peterson, *Powder, Crack Effects Called Same,* Minneapolis Star–Tribune, Oct. 18, 1991, at 1B (remarks of Dr. Dorothy Hatsukami, Professor of Psychiatry at the University of Minnesota).

Still, the widespread belief that crack is more dangerous than powder cocaine persists. The majority of those arrested for crack cocaine are black, a fact noted not only by the defendant but by the Minnesota Department of Public Safety. Crack raids focus on black homes; suburban and greater Minnesota police have not engaged in as many drug raids against white suspects. This makes the war on drugs "look[ ] like a war on minorities." *See* Minnesota Depart-

ment of Public Safety, Office of Drug Policy, *Report to the 1991 Minnesota Legislature* 11 (1990). There may be many reasons for this, some defensible, others not. For example, the use and sale of crack is more visible than the use and sale of powder cocaine, so those next to crack houses will ask the police to raid the operations, leaving the more private powder cocaine operations unscathed. *Id.* On the other hand, parts of our society view the young black male as a figure of social disruption, and will seek to punish him more harshly than his white suburban counterpart. *Cf.* Martha Myers, *Symbolic Policy and the Sentencing of Drug Offenders,* 23 Law & Society Rev. 295, 310, 312 (1989) (in study of Georgia drug sentencing from 1977 to 1985, black drug traffickers more likely to be imprisoned than whites).

For whatever reason, offenders convicted of trafficking in crack cocaine face far more severe penalties than those who have sold powder cocaine. As the court points out, the "100 to 1" ratio effectively quintupled Willis' sentence; he faced a guidelines range of 188 to 235 months rather than 41 to 51 months. *See ante* at 1225 n. 2. The district court sentenced Willis at the bottom of the guidelines range, but made it clear that he felt the guidelines sentence was excessive and a "tragedy."

> I'm going to give you the least I can possibly give you, and I will go one step further, and the one step isn't going to be worth a whit until maybe sometime in the future. But the one step is I'm going to beg the Congress to reconsider what they've done here. This is not right. You've done wrong, you've done a wrong thing, but if there's any good in you, it's going to take a long time for you to be able to show it, and I wish it could be less time.

Willis, age 21 when sentenced, will be in prison for about 17 years. During this time he is unlikely to receive drug treatment or helpful job training. Unless the executive branch grants Willis clemency or brings a Rule 35 motion, Willis will be a middle-aged man when he emerges from the prison system with little prospects for meaningful employment.

If there were any evidence that our current policies with respect to crack were deterring drug use or distribution the extreme sentence might be justified. Unfortunately, there is none. As one small time crack dealer is confined another takes his place. Until our society begins to provide effective drug treatment and education programs, and until young black men have equal opportunities for a decent education and jobs, a bad situation will only get worse. All of us and our children will suffer.