Seli **FAKORZI** and Victor Cornejo Plaintiffs,

v.

**DILLARD'S, INC.** a/k/a/ Dillard Department Stores, Inc., d/b/a/ Dillard's, City of Coralville, Iowa, Barry Bedford, Shane Kron, and Brian DeBoer, Defendants

No. 3–01–CV–10183.

United States District Court, S.D. Iowa, Davenport Division.

March 11, 2003.

---

Tom J. Riley, Anne Updegraff, Tom Riley Law Firm, Cedar Rapids, IA, for Plaintiffs.

Thomas D. Waterman, Lane & Waterman, Davenport, IA, Jeremiah J. Morgan, Bryan Cave, Lynn S. McCreary, Charles B. Jellinek, Bryan Cave LLP, Kansas City, MO, Terry J. Abernathy, Thad J. Collins, Pickens Barnes & Abernathy, Cedar Rapids, IA, for Defendants.

## ORDER

LONGSTAFF, Chief Judge.

The Court has before it motions for summary judgment, filed by defendant Dillard's, Inc., a/k/a Dillard Department Stores, Inc., ("Dillard's") on September 18, 2002, and defendants City of Coralville, Barry Bedford, Shane Kron, and Brian

DeBoer ("city defendants") on September 19, 2002. Plaintiff resisted Dillard's motion on October 17, 2002, and supplemented that resistance on October 18, 2002. Dillard's filed a reply on November 4, 2002. On October 17, 2002, plaintiffs also filed a resistance to the motion filed by the city defendants. The city defendants filed a reply on November 4, 2002. The matter is now fully submitted.

## I. BACKGROUND

The following facts are either not in dispute or viewed in a light most favorable to plaintiffs.

On October 4, 2001, Seli Fakorzi ("Fakorzi") and Victor Cornejo ("Cornejo") went to Dillard's at the Coral Ridge Mall in Coralville, Iowa. Fakorzi is an African–American woman, and Cornejo is Hispanic. At approximately the same time Fakorzi and Cornejo were shopping for a dress in Dillard's, an African–American couple was making purchases at Younkers Department Store, located in another part of the mall. This couple purchased a variety of clothing items with a total cost of between $600 and $700. They paid by check. After the couple left Younkers, a store clerk discovered they had forgotten one of the sacks containing a portion of their purchases. The clerk retrieved the check from the cash register and called the telephone number listed on the check. The clerk reached someone at the telephone number who informed her the checks had been stolen and were no longer in the possession of the person named on the check. The Younkers employee notified her supervisor, who then called the Coralville Police Department.

After receiving the call, Coralville Police Officers went to Younkers and obtained a description of the suspects. The couple was described as an African–American female wearing knee-high leather boots and black fishnet stockings, and an African–American male. Sergeant Shane Kron ("Kron") of the Coralville Police Department and Craig Voparil ("Voparil"), a mall security officer, walked the entire mall trying to locate the suspects. When the two entered Dillard's, Jennifer Weigelt ("Weigelt"), an assistant manager at Dillard's, approached Kron and asked if there was anything she needed to know. He gave her a description of the couple. Almost simultaneously Kron, Voparil, Weigelt and Nathan Bedford, a Dillard's employee, saw the described woman. Bedford then indicated that the male suspect was in the shoe department. Kron apprehended the male suspect, handcuffed him, and began taking him to his squad car. Sergeant DeBoer ("DeBoer") arrived, was informed of the situation, and apprehended the female suspect.

During this time, plaintiffs had left Dillard's and were shopping in other stores in the mall. Some time later, they returned to Dillard's and purchased an undergarment in the lingerie department for $33.60. Fakorzi paid for the undergarment by personal check, and the check was processed without incident.

Fakorzi then returned to Dillard's dress department with the intention of purchasing a dress that was being held for her. She wrote the sales associate a check in the amount of $178.50. When Mary Jo Young ("Young"), the sales associate, tried to process the check through Dillard's system, she received an "error message" indicating the check would not be approved for reasons other than insufficient funds. The error message was a result of Dillard's policy allowing a customer to write an aggregate of no more than $200.00 in checks at Dillard's in one day. If a customer writes more than one check in one day, and the sum of the checks exceeds $200.00, Equifax automatically declines the

check. While Weigelt was aware of this policy, plaintiffs and Young were not.

While Young was trying to process Fakorzi's check, Fakorzi saw another rack of dresses she had not seen earlier. She found a different dress, tried it on, changed back into her clothes, and then went to look for Cornejo to get his opinion on the dress.

In the meantime, Young reported the check problem to her supervisor, Weigelt. Weigelt went to the dress department to investigate and then called the police. The dispatch tape records Weigelt's report as follows:

Weigelt: "Hi, this is Jennifer calling from Dillard's."

Dispatcher: "Ok."

Weigelt: "We have a third person here."

Dispatcher: "Oh, a third person that showed up with these two?"

Weigelt: "Yes. And the ones that were here just left."

Dispatcher: "OK. What's the description?"

Weigelt: "I have" (stops to ask someone apparently in the store) "Can you just call her? She is a woman in a tan dress. She's got braids in her hair."

. . . . .

Dispatcher: "How do you know that she's with them, I guess?"

Weigelt: "She said she was going to look for this guy and described him."

Dispatcher: "OK."

Weigelt: "And she tried using a check and."

Dispatcher: "Was it the same one?"

Weigelt: "I don't know if it was the same one but Equifax declined it for another reason."

Dispatcher: "OK. Hang on a second."

(Plaintiff's Appendix, at 211–12).

While DeBoer and Kron were waiting in squad cars to coordinate the transportation of the previously arrested forgers (the Leapharts) to the Coralville Police Department, the officers heard the following dispatch:

Dispatcher: "Apparently, there was a third female there in a tan dress trying to pass a bad check on a different account and it was still declined-not sure why it was declined."

. . . . .

Dispatcher: "I don't know. This third person came up to the counter and tried to write another check. The check was declined and when it was declined she said she was going to go to try to find her other two friends to get it straightened out and she described the other two friends and it matched the two suspects you guys have in custody."

(*Id.*, at 214–15). Kron then asked Mr. Leaphart if he knew who the two additional subjects might be. Mr. Leaphart didn't give a clear response. He said that "he had his rights read to him and he was only going to say he was with his wife." (Plaintiff's Brief In Support of Resistance To Motion For Summary Judgment From Defendants City of Coralville, *et. al.*, at 6). DeBoer returned to Dillard's to investigate.

Nathan Bedford led DeBoer and mall security guard, Voparil, to the Dillard's dress department where plaintiffs were shopping. Voparil recalls that they were looking for two African Americans. Dillard's employees gave Deboer an indication that plaintiffs were the people whose check had just been rejected by Equifax. DeBoer approached plaintiffs and told them to come with him. He asked Fakorzi whether the dress she was wearing belonged to Dillard's. When he found out that it was a Dillard's dress, DeBoer ordered Weigelt to accompany Fakorzi into

the dressing room so Fakorzi could change into her street clothes.

While in the dressing room, Fakorzi asked Weigelt what was happening. Weigelt said that she did not know, and that the police would explain. Fakorzi inquired whether the situation had anything to do with the check she had written earlier that day at Dillard's. Weigelt did not tell Fakorzi about the combined check limit of $200.00. Instead, she again told Fakorzi that the police would explain.

In the meantime, DeBoer asked Cornejo what he was doing at Dillard's. Cornejo replied that he and Fakorzi were looking for a dress. DeBoer then asked Cornejo for identification, which he did not have. Conrejo alleges that DeBoer handcuffed him before he had an opportunity to respond to DeBoer's request for identification.

After Fakorzi changed into her street clothes, DeBoer led her and Cornejo out of Dillard's. Bedford followed them, toting the plaintiffs' belongings. Once outside Dillard's entrance, DeBoer and Kron handcuffed Fakorzi. DeBoer told plaintiffs that the handcuffs were for their own safety. Cornejo asked the officers to loosen his handcuffs, claiming they were too tight and hurting him. The officers did not loosen the handcuffs. DeBoer then told Bedford to stay with plaintiffs inside the Dillard's vestibule area. While in the vestibule, Bedford told plaintiffs several times that they were not under arrest and were not being charged with any crime. Some time later, DeBoer and Kron returned and escorted plaintiffs to their police cars.

Kron took Fakorzi to his car and immediately started to investigate plaintiffs' possible involvement in the check forgeries. Kron telephoned the number listed on Fakorzi's check and reached Fakorzi's mother, with whom he allowed Fakorzi to speak. After listening to them for a minute or two, he concluded that a mistake had been made, and that plaintiffs were not involved with the Leapharts. Plaintiffs were immediately released. In explaining the situation, Kron told Cornejo that the officers thought plaintiffs were "involved with someone who was writing bad checks." (Plaintiff's Appendix, at 10; Cornejo deposition). Kron similarly told Fakorzi that the officers believed plaintiffs were part of a group of African–Americans that were writing bad checks. (*Id.* at 43; Fakorzi deposition).

The officers did not formally tell plaintiffs they were placing them under arrest. Approximately 30 minutes passed from the time Fakorzi was approached by DeBoer in Dillard's and the time she was released. She spent approximately 9 of those 30 minutes in Kron's squad car.

Plaintiffs filed the following claims against Dillard's: (1) false arrest/imprisonment; (2) violations of 42 U.S.C. § 1981 and § 1982; and (3) assault and battery. In their reply brief, plaintiffs concede that their assault and batter claim against Dillard's is without merit. (Plaintiff's Memorandum of Authorities in Support of Resistance to Defendant Dillard's Motion for Summary Judgment, at 2). Plaintiffs filed the following additional claims against the city defendants: (1) violations of 42 U.S.C. § 1983; (2) violations of the Iowa Constitution, Article I, § 8; (3) false imprisonment; (4) assault and battery; and (5) violations of 42 U.S.C. § 1981 and 1982.

## II. APPLICABLE LAW AND DISCUSSION

### A. Summary Judgment

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Walsh v. United States*, 31

F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

B. 42 U.S.C. § 1983

i. Liability of Officer Kron and Officer Deboer under § 1983

■■■ Plaintiffs allege the individual officers violated their constitutional rights giving rise to a cause of action under § 1983 when the officers detained plaintiffs at Coral Ridge Mall on October 4, 2001. "To establish a claim under 42 U.S.C. § 1983 [a plaintiff] must show a deprivation of a right, privilege, or immunity secured by the constitution or laws of the United States." *Dunham v. Wadley,* 195 F.3d 1007, 1009 (8th Cir.1999). A prima facie case under § 1983 requires plaintiffs to show defendants: (1) acted under color of law; and (2) caused constitutional violations that damaged plaintiffs. *Reeve v. Oliver,* 41 F.3d 381, 383 (8th Cir.1994). For purposes of this motion for summary judgment, there is no dispute the officers were acting under color of State law. The question is whether they violated plaintiffs' constitutional rights.

■■■ Plaintiffs' § 1983 claims are based on alleged violations of the Fourth Amend-ment's prohibition "against unreasonable searches and seizures." U.S. Const. Amend IV. To determine whether the seizure in this case was lawful, the Court must first determine whether the officers' conduct constituted an arrest or merely an investigative, *Terry*-type detention.

■■■ "There is no bright line of demarcation between investigative stops and arrests." *United States v. Miller,* 974 F.2d 953, 957 (8th Cir.1992). "An investigative stop may become an arrest if it lasts for an unreasonably long time or the officers use unreasonable force in executing it." *Id.* at 956. While "officers may check for weapons and may take any additional steps reasonably necessary to protect their personal safety and maintain the status quo during the stop, [ ] they must employ the least intrusive means of detention reasonably necessary to achieve the *Terry* stop's purposes." *Id.* at 957. "[T]he determination of whether an arrest has occurred for Fourth Amendment purposes does not depend upon whether the officers announced that they were placing the suspects under arrest." *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Instead, "[a]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Rose,* 731 F.2d 1337, 1342 (8th Cir.1984). In determining whether the amount of force used during an investigatory stop constitutes an arrest, the Court will consider the following factors: "(1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6)

whether there was an opportunity for the officer to have made the stop in less threatening circumstances."

*United States v. Thompson,* 906 F.2d 1292, 1296 (8th Cir.1990) (citing *United States v. Seelye,* 815 F.2d 48, 50 (8th Cir.1987)).

The Court finds that under the circumstances, the officers' conduct was more intrusive than necessary for a *Terry* stop. DeBoer was the sole officer in Dillard's at the time he confronted plaintiffs. However, at DeBoer's side were Nathan Bedford, a part-time sales associate at Dillard's and a reserve with the Johnson County Sheriff's Office, and Mr. Voparil, a Coral Ridge Mall security guard. Thus, while technically DeBoer was outnumbered by the suspects, under the circumstances, the first *Thompson* factor provides little justification for handcuffing plaintiffs and placing them in squad cars.

The second factor considered is the nature of the crime and whether there is reason to believe the suspects are armed. The crime suspected, forgery, is not a crime of violence like drug trafficking or murder. *See, e.g., United States v. Navarrete–Barron,* 192 F.3d 786, 791 (8th Cir. 1999) (limits of *Terry* stop were not exceeded where officers handcuffed suspected drug traffickers and placed them in squad cars, because the actions were reasonably necessary to maintain the status quo). Furthermore, nothing in the record suggests that the officers thought plaintiffs were armed. In fact, DeBoer did not frisk plaintiffs. He also sent Weigelt, a Dillard's employee, into the dressing room with Fakorzi. If DeBoer thought Fakorzi posed a danger, he would have frisked her, and he would not have left Weigelt alone with her. The Court finds that this factor weighs in favor of finding that plaintiffs were arrested.

The third factor is the strength of the officer's suspicions. DeBoer went into Dillard's to investigate after he heard a dispatch indicating that "a third female ... [was] trying to pass a bad check on a different account." (Plaintiff's Appendix, at 214–15). The dispatcher further reported that the suspect "was going to go to try to find her other two friends to get it straightened out," and that the other two friends matched the descriptions of the Leaphart forgers, who were already in custody *Id.* Before going into Dillard's to investigate, Kron asked Mr. Leaphart if he knew who the additional suspects might be. Mr. Leaphart gave what Kron considered an evasive response. These facts gave DeBoer a reasonable suspicion to confront plaintiffs.

The fourth and fifth factors weigh heavily in favor of finding that plaintiffs were arrested. Nothing in the record suggests there was a need for immediate action, and plaintiffs did not act suspicious or hostile when DeBoer approached them.

The final factor to consider is whether DeBoer could have made the stop in "less threatening circumstances." *Thompson,* 906 F.2d at 1296. In other words, could DeBoer have accomplished his investigative objective without handcuffing plaintiffs and placing them in separate squad cars. When DeBoer approached plaintiffs, he made only three inquiries. He asked Fakorzi whether the dress she was wearing was Dillard's merchandise; he asked Cornejo why he was in Dillard's; and he asked Cornejo for identification. Cornejo responded that he and Fakorzi were shopping for a dress, and Fakorzi said that she was trying on a Dillard's dress. However, before Cornejo responded to DeBoer's request for identification, DeBoer handcuffed him. The Court finds that DeBoer's suspicions could have been dispelled quickly, had he simply asked a few more questions. DeBoer did not bother to ask a Dillard's employee to see the check that plaintiff wrote and Equifax declined; he did not

ask plaintiffs if the check Fakorzi used was in her name or if Fakorzi had identification; he did not ask plaintiffs where they resided; and he did not inquire whether plaintiffs knew the Leaphart forgers. Had DeBoer asked to see the check and called the phone number on it, he would have quickly realized that plaintiffs were not involved in any crime. However, instead of making these quick, simple inquiries, DeBoer handcuffed plaintiffs and placed them in squad cars.

The Court finds that handcuffing plaintiffs and placing them in separate cars was not a reasonable *Terry* stop under the circumstances. Applying the *Thompson* factors, the Court finds that plaintiffs' thirty-minute detention exceeded the bounds of a *Terry* stop and, instead, constituted an arrest. *See Peterson v. City of Plymouth,* 945 F.2d 1416, 1420 (8th Cir.1991) (finding an arrest where officers removed plaintiff from his house and locked him in the back of a squad car for twenty minutes).

 The Court will next consider whether plaintiffs' arrest violated their Fourth Amendment rights. For an arrest to be valid under the Fourth Amendment, the arrest must be supported by probable cause. "Probable cause exists if the totality of the facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense at the time of the arrest." *Smithson v. Aldrich,* 235 F.3d 1058, 1062 (8th Cir.2000) (internal quotations omitted). *See also, Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948) ("Probable cause exists where the facts and circumstances within [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution to the belief that an offense has been or is being committed.") (internal quotation omitted). The Court does not

evaluate each piece of information independently, but rather considers "all of the facts for their cumulative meaning." *United States v. Nation,* 243 F.3d 467, 470 (8th Cir.2001). "[T]he probability, not a prima facie showing, of criminal activities is the standard of probable cause." *United States v. Wallraff,* 705 F.2d 980, 990 (8th Cir.1983). The difference between probable cause and reasonable suspicion is based on the quantity, quality, and reliability of the evidence available to the officers at the time of the detention. *United States v. Wheat,* 278 F.3d 722, 731 (8th Cir.2001).

As previously discussed, Weigelt called the Coralville Police Department after she was informed that Fakorzi's check had been declined by the Equifax system. While in his squad car, DeBoer heard a dispatch indicating that "a third female . . . [was there] trying to pass a bad check on a different account." (Plaintiff's Appendix, at 214). The dispatcher reported that the suspect's check was declined for unknown reasons. He further reported that the suspect said her friends could help "straighten out" the situation, and that the suspect's description of the friends matched the Leapharts. (*Id.* at 214–15). After hearing the dispatch, Kron asked Mr. Leaphart if he knew who the additional suspect might be. Mr. Leaphart said that "he had his rights read to him and he was only going to say he was with his wife." (Plaintiff's Brief in Support of Resistance To Motion For Summary Judgment From Defendants City of Coralville, et. al., at 6). With this knowledge, DeBoer returned to Dillard's. Bedford led DeBoer to the dress department and pointed to plaintiffs' location, indicating that they were the suspects. DeBoer approached plaintiffs and asked Fakorzi if the dress she was wearing belonged to Dillard's. She said that she had just tried it on. He then asked Cornejo the reason for his visit

to Dillard's. Cornejo said they were there to purchase a dress. DeBoer asked Cornejo for identification, but before Cornejo could reply, he placed Cornejo in handcuffs. Moments later, Kron handcuffed Fakorzi, and the officers placed plaintiffs in separate squad cars.

The probable cause question is a close one. The officers had already arrested the Leapharts for passing stolen checks; they knew that Fakorzi's check was declined; and they had some reason to believe that plaintiffs were associated with the Leapharts, because Fakorzi's description of her friends matched the Leapharts. The officers received this information from the dispatcher, who took Weigelt's call. Weigelt was a reliable source of information, *see* *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 438–39, 442 (7th Cir.1986) (holding that the information a store security guard gave police was sufficiently reliable, and that police did not need to interview available witnesses to establish probable cause), but was the quantity and quality of her information enough to establish probable cause to arrest plaintiffs?

Fakorzi's check was declined by Equifax for unknown reasons. This fact does not suggest Fakorzi was engaged in illicit activity. Nevertheless, DeBoer failed to investigate the reason the check was declined before he handcuffed plaintiffs and placed them in squad cars. DeBoer also knew Fakorzi's check was drawn on a different account than the Leapharts. While this fact did not rule out the possibility that plaintiffs and the Leapharts were working together, it should have led DeBoer to question whether the parties were conspiring to commit forgery. DeBoer made no such inquiry. The only thing linking plaintiffs to the Leapharts, of which DeBoer was aware, was the dispatcher's general statement that Fakorzi's description of her friends "matched" the Leapharts. DeBoer did not know the way

in which Fakorzi described her friends. Therefore, he could not determine whether her description in fact matched the Leapharts, and if so, how much weight to give that information. Finally, when DeBoer approached plaintiffs, they were non-hostile and cooperative. This further diminished the likelihood that they were involved in a crime.

Under the totality of the circumstances, the Court finds the officers did not have probable cause to arrest plaintiffs. While the quantity, quality, and reliability of information the officers possessed gave them reasonable suspicion to make a *Terry*-type detention, it did not rise to the level of probable cause. The Court therefore finds that Kron and DeBoer violated plaintiffs' Fourth Amendment rights by arresting them without probable cause.

The Court must next consider whether Kron and DeBoer are entitled to qualified immunity plaintiffs' § 1983 claims. "Qualified immunity shields the defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson,* 235 F.3d 1058, 1061 (8th Cir.2000). "The qualified immunity standard gives ample room for mistake in judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotations omitted). In the Fourth Amendment context, "law enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so-provided that the mistake is objectively reasonable." *Id.* at 1062. In other words, "The issue for immunity purposes is not probable cause in fact but *arguable* probable cause." *Id.* The Court finds that under the totality of circumstances, DeBoer and Kron had *arguable* probable cause to arrest plaintiffs.

Therefore, summary judgment is granted in favor of DeBoer and Kron on plaintiffs' § 1983 claims.

ii. Liability of the City of Coralville under § 1983

 Plaintiffs assert that the City of Coralville failed to adequately train its officers on the use of handcuffs. To establish its failure to train theory, plaintiffs must show that the city's "failure to train its employees in a relevant respect evi- dences a deliberate indifference" to plaintiffs' rights. *Thelma D. v. Bd. of Ed. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir.1991) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). To constitute deliberate indifference, plaintiffs must show that the city "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Id.* This notice may be actual or implied. As the Eighth Circuit explained in *Thelma*, "notice may be implied where failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious." 934 F.2d 929, 934 (8th Cir.1991).

> For example, in *[City of Canton v.] Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the [Supreme] Court noted that because police officers are armed by a municipality and the officers are certain to be required on occasion to use force in apprehending felons, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Id.*

The reasoning of *Harris* applies with equal force to the case at bar. The City of Coralville gives its officers handcuffs with the expectation that they will use them in arresting suspected criminals when necessary. Just as the officers in Harris were "certain to be required on occasion to use force in apprehending felons," *Harris*, 489 U.S. at 390, 109 S.Ct. 1197, Coralville police officers have recurring occasions to make arrests and must frequently determine whether to handcuff potential suspects. The Court finds that a failure to train officers in the appropriate use of handcuffs is "so likely to result in a violation of constitutional rights that the need for training is patently obvious." *Harris*, 489 U.S. at 390, 109 S.Ct. 1197. Therefore, notice to the City is implied in this case.

 Genuine issues of material fact exist on the adequacy of the City's training. One page of the Coralville Police Departments' training materials pertains to handcuffing. This page sets forth the following three instances where the increased restraints of handcuffs is appropriate:

> [1] there are facts to indicate that the person is likely to cause injury ...; or [2] there is evidence that the person has one or more dangerous weapons and has made threatening statements or acts against the officer or other people; or [3] the number of aggressive and threatening persons is greater than the number of officers, and there are facts to indicate that they pose a danger of causing injury.

Plaintiff's Appendix, at 261. None of these justifications for handcuffing were present when DeBoer and Kron handcuffed plaintiffs. This calls into question whether the officers' instruction is adequate. *See Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1088 (9th Cir.2000) (holding that the adequacy of the officers' training was called into question by the inappropriate handling of the incident that led to the suit.) Further calling into question the adequacy of the City's training is DeBoer's

statement: "We really don't have a policy on handcuffing." (Plaintiff's Appendix, at 193.)

Viewing the facts in a light most favorable to plaintiffs, the Court finds genuine issues of material fact relating to plaintiffs' § 1983 failure to train claims against the City. Therefore, defendants' motion for summary judgment on this claim is denied.

### iii. Liability of Chief Bedford under § 1983

Plaintiffs also sued Barry Bedford, Chief of the Coralville Police Department, under § 1983 for his alleged failure to train Coralville police officers. Plaintiffs' Amended Complaint does not specify whether Chief Bedford is being sued in his individual or official capacity. "If the complaint does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity." *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1182 (8th Cir.1998). Because there is no reference in either the heading or the body of plaintiffs' Amended Complaint to Chief Bedford specifically being sued in his individual capacity, he is, as a matter of law, sued in his official capacity only. As such, the claim against him is redundant to the claim against the City. *See Id.* The Court grants defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim against Chief Bedford.

### C. Iowa Constitutional Claims

Plaintiffs allege that all of the defendants violated the Iowa Constitution, based on the same facts giving rise to their § 1983 claims. The Court is unable to resolve this claim on summary judgment on the record before it. Accordingly, a hearing on this claim will be held by conference call as scheduled below.

### D. Iowa False Arrest/Imprisonment

#### i. City of Coralville, Chief Bedford, Kron and DeBoer

Plaintiffs make claims for false arrest and false imprisonment against all City defendants. "In Iowa, false arrest is indistinguishable from false imprisonment ...." *Barrera v. Con Agra, Inc.*, 244 F.3d 663, 666 (8th Cir.2001). The torts are defined as "an unlawful restraint on freedom of movement or personal liberty." *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982). To make a prima facie case of false imprisonment, plaintiffs must show that they were unlawfully restrained against their will. *Children v. Burton*, 331 N.W.2d 673, 678–79 (Iowa 1983). For purposes of this motion, defendants do not dispute plaintiffs were detained against their will. The question presented is whether the restraint was unlawful, and if so, whether defendants can justify their actions based on "reasonable grounds." *Children*, 331· N.W.2d at 679.

As the Court previously discussed, the detention of plaintiffs constituted arrests without probable cause. The arrests were therefore unlawful, as they violated the Fourth Amendment. This does not end the inquiry for purposes of the false arrest/imprisonment claims. Defendants correctly note that under Iowa law, an officer may make a warrantless arrest if he has a "reasonable ground" for believing a crime has been committed. *Children*, 331 N.W.2d at 679; *see also*, Iowa Code § 804.7(3)·(2003). Iowa Courts have stated that "[t]he expression 'reasonable ground' is equivalent to traditional 'probable cause.'" *Id.* However, "in dealing with civil damage action for false arrest, courts apply a probable cause standard *less demanding* than the constitutional probable cause standard in criminal cases." *Id.* at 680 (emphasis

added). "If the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Id.*

The undisputed facts show that the officers' decision to make an arrest was based on a "reasonable belief" that plaintiffs had committed a crime.[1] They were acting on information received from the dispatcher and Dillard's employees that suggested plaintiffs committed a serious crime. Nothing in the record suggests the officers acted in bad faith. Because the officers' actions were based upon a "reasonable ground" that a crime had been committed, the Court grants summary judgment in favor of the city defendants on plaintiffs' false arrest/imprisonment claims.

ii. Dillard's

■ The Court will next consider the false arrest/imprisonment claims plaintiffs filed against Dillard's. As noted, false arrest and false imprisonment claims are indistinguishable under Iowa law. Both torts are defined as "an unlawful restraint on freedom of movement or personal liberty." *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982). The Court must therefore address two issues: (1) whether Dillard's restrained plaintiffs' freedom of movement or personal liberty; and (2) whether that restraint was unlawful.

Plaintiffs allege that Dillard's employee, Nathan Bedford, participated in their arrest. Bedford admitted that DeBoer told him to follow along when DeBoer escorted the handcuffed plaintiffs out of the store. (Plaintiffs' Appendix, at 113). Bedford further admitted that after the officers escorted plaintiffs from the store, Kron and DeBoer left Bedford alone with plain-

tiffs in the Dillard's vestibule area and instructed him to stay with the handcuffed plaintiffs. It is unclear from the record how long Bedford supervised the handcuffed plaintiffs. Under these circumstances, the court finds that genuine issues of material fact exist on whether a Dillard's employee restrained plaintiffs' freedom of movement or personal liberty.

Assuming Dillard's restrained plaintiffs' freedom of movement or personal liberty, the Court must consider whether such restraint was lawful. The undisputed facts show that if Nathan Bedford restrained plaintiffs' liberty, he did so at the direction of the Coralville police. Accordingly, he may have been privileged to use such force at common law. The Court found no Iowa law precisely on point. However, the Restatement of Torts (Second) provides guidance. Section 139.(1) of the Restatement provides: "The actor is privileged to use force against another for the purpose of assisting a third person to make or maintain an arrest or re-arrest if the third person is himself privileged to make the arrest." *See also* Restatement § 45A, Comment e ("One who takes part in a false imprisonment, by aiding another to make it, becomes liable as if he had acted by himself. This Section should, however, be read together with § 139, which states a privilege to assist a peace officer in making an arrest for a criminal offense, where the actor is not convinced that the officer is not privileged to make it.") As previously discussed, the police officers' conduct in this case was privileged, and Nathan Bedford acted with the goal of assisting the police officers. Applying the principle outlined in the Restatement, the Court holds as a matter of law that Dillard's restraint on plaintiffs' liberty was privileged.

---

1. This finding is not at odds with the Court's earlier finding that the officers lacked probable cause to make an arrest. As discussed,

"reasonable belief" in the false arrest context is a less demanding standard than traditional probable cause.

Therefore, the Court grants Dillard's motion for summary judgment on plaintiffs' false arrest/imprisonment claims.

### E. Assault and Battery

■ Plaintiffs also filed claims of assault and battery against the City defendants. The civil definitions of assault and battery are set forth in Iowa's Civil Jury Instructions. Instruction 1900.2 defines assault as follows:

An assault is committed when a person does: (1) an act intended to put another in fear of physical pain or injury; (2) an act intended to put another in fear of physical contact which a reasonable person would deem insulting or offensive; and the victim reasonably believes that the act may be carried out immediately.

(citing *State v. Straub*, 190 Iowa 800, 180 N.W. 869 (1921), and Restatement of Torts (Second), §§ 21, 31, and 32).

Officers handcuffed plaintiffs, physically removed them from Dillard's, and placed them in squad cars. The question is whether these actions were *intended* to put plaintiffs in fear of physical pain or injury. There is no direct evidence in the record suggesting DeBoer or Kron sought to evoke fear in plaintiffs. However, as Iowa Civil Jury Instruction 1900.5 explains, intent is "seldom capable of being proven by direct evidence" and can be

inferred from purposeful action.[2] The undisputed facts show that the officers purposefully handcuffed plaintiffs and placed them in squad cars. As previously discussed, the officers could have conducted the investigation in far less threatening ways. Whether the officers intended to invoke fear in the plaintiffs-based on the natural consequences of their purposeful action-is a fact question that the Court must leave for the jury. Therefore, the Court denies defendants' motion for summary judgment on plaintiffs' assault claims.[3]

■ The Court will briefly turn to plaintiffs' battery claim. Iowa Civil Jury Instruction 1900.4 provides:

A battery is committed when a person intentionally does: 1. An act resulting in bodily contact causing physical pain or injury. 2. An act results in bodily contact which a reasonable person would deem insulting or offensive.

(citing Restatement of Torts (Second), §§ 13, 18). Cornejo claims that DeBoer handcuffed him too tightly. He further claims that the officers denied his request to loosen the handcuffs after he told them he was in pain. Both plaintiffs endured physical restraint that a reasonable person would find insulting or offensive. The officers' actions were purposeful, and for the

---

**2.** "Intent means doing something on purpose as opposed to accidentally. Because intent requires a finding of what a person is thinking when doing an act, it is seldom capable of being proven by direct evidence .... You may find that if a person does an act on purpose, the person also intended the natural results of the act." Iowa Civil Jury Instruction 1900.5.

**3.** "Iowa courts have sometimes looked to the [Iowa] criminal code's definition of assault as defining the elements of assault in civil actions for damages or other relief." *Doe v. Hartz*, 52 F.Supp.2d 1027, 1052 (N.D.Iowa 1999). This Court notes that the definition for assault found in the Iowa Civil Jury In-

structions and the Iowa Code's definition of criminal assault are nearly identical. *Compare* Iowa Code, § 708.1, and Iowa Civil Jury Instruction 1900.2. However, unlike the jury instruction, the code definition of criminal assault provides an exception for a defendant whose actions are "justified." *See* Iowa Code § 708.1 ("A person commits assault when, without justification, the person does any of the following ...."). Even if the Court were to adopt the definition provided in the criminal code, it would still deny defendants' motion for summary judgment. It is for the jury to decide whether the officers' actions were "justified" for purposes of these tort claims.

same reasons explained above, it is for the jury to determine whether the officers acted with the requisite intent. Therefore, the Court denies defendants' motion for summary judgment on plaintiffs' battery claim.[4]

### F. 42 U.S.C. § 1981

 Plaintiffs filed claims against Dillard's and the City defendants for violations of 42 U.S.C. §§ 1981 and 1982. Section 1981 provides, in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every state ... to make and enforce contracts ... as enjoyed by white citizens .... [T]he term "make and enforce contracts" includes the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship...

To sustain a claim of racial discrimination under § 1981, plaintiffs must establish three elements: (1) that they are members of a racial minority; (2) that Dillard's had intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute, in this instance, the making and enforcing of a contract. *See Morris v. Dillard Department Stores, Inc.,* 277 F.3d 743, 751 (5th Cir.2001). The first element is met, as Fakorzi is African American and Cornejo is Hispanic. Plaintiffs allege they would have purchased the dress from Dillard's had they not been detained by the police. Thus, the third element is met. *See Id.* at 752 ("[W]here a customer has engaged in an actual attempt to contract that was thwarted by the merchant, courts

have been willing to recognize a § 1981 claim."); and *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 874 (6th Cir. 2001) ("[W]e have no trouble concluding that [plaintiff] made herself available to enter into a contractual relationship for services ordinarily provided by Wal–Mart: the record reflects that she had selected merchandise to purchase ... and would, in fact, have completed her purchase had she not been asked to leave the store."). The question remaining is whether plaintiffs satisfied the second element-that Dillard's intended to discriminate on the basis of race.

Because plaintiffs' discrimination claims are "based on inferences to be drawn from circumstantial evidence, [they] are governed by the familiar burden-shifting analysis." *Carter v. St. Louis Univ.,* 167 F.3d 398, 401 (8th Cir.1999). If plaintiffs establish a prima facie case of intentional racial discrimination, the burden shifts to defendants to offer a legitimate, nondiscriminatory reason for their actions. *See Carter,* 167 F.3d at 401. If defendants make such a showing, the burden then shifts to plaintiffs to present evidence that defendants' proffered reason was a pretext for unlawful discrimination. *Id.* Plaintiffs may demonstrate the unlikeliness of the non-discriminatory reason by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the ... proffered legitimate reasons." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3rd Cir.1994). The question is whether "a reasonable fact finder *could* rationally find [defendant's proffered reasons] unworthy of credence ...." *Id.* (emphasis in origi-

---

4. Defendants argue that summary judgment is appropriate, because law enforcement officers enjoy a privilege/immunity that shields them from liability on both the assault and battery claims plaintiffs raise. *See* Restatement of Torts (Second), §§ 118, 120A, 121, 127, 132. However, the Restatement of Torts (Second)

§ 132 recognizes that privilege/immunity does not apply if the officer uses more than a reasonable amount of force. Whether or not DeBoer and Kron exceeded a reasonable amount of force when they handcuffed plaintiffs and placed them in squad cars is a question of fact for the jury.

nal). "In determining whether a plaintiff has met its burden with respect to pretext in a summary judgment motion, a district court is prohibited from making a credibility judgment or a factual finding from conflicting evidence." *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir.2001).

i. Dillard's

█ Plaintiffs established a prima facie case of racial discrimination against Dillard's. Dillard's employees knew that having a check declined did not equate to forgery or criminal activity, yet no Dillard's employee asked Fakorzi to make alternative arrangements to pay for the dress after the check was declined. Dillard's employees didn't inquire about alternative arrangements, because they assumed plaintiffs were attempting to commit forgery. Dillard's employees reached this conclusion without even calling the telephone number listed on the check. Furthermore, Weigelt was aware of Dillard's $200.00 check writing limit and knew that Fakorzi had written a check earlier in the day at Dillard's. Nevertheless, she failed to consider that the check writing limit was the reason the check was declined. The record shows that Weigelt's failure to consider this possibility was not an oversight, as Fakorzi specifically asked Weigelt whether the check she wrote earlier in the day had anything to do with the problem she was experiencing. Weigelt replied that she didn't know, and that he police would explain everything. Weigelt could not have expected the police to be able to explain the $200.00 check limit, as they were not aware of Dillard's policy. The Court finds that a reasonable jury could infer discriminatory intent based on the above evidence.

Dillard's articulated the following non-discriminatory reasons for its employees' actions: (1) earlier in the evening Weigelt had been advised by police of the presence of forgers in the store; (2) Fakorzi's check was rejected by Equifax moments after the Leaphart forgers were arrested in Dillard's; and (3) two shoppers told Weigelt that Fakorzi was acting strangely and was believed to be with the Leapharts. These reasons are sufficient under *Carter* to shift the burden back to plaintiffs.

Plaintiffs argue that Dillard's proffered reasons are fabricated and pre-textual. Plaintiffs challenge defendants' claim that Weigelt received information from nearby shoppers linking plaintiffs to the Leaphart forgers. Plaintiffs note the two alleged shoppers have not been identified by Dillard's. Apparently, Weigelt did not ask the shoppers for their names, nor did she ask them to speak with the police. Under the circumstances, the Court finds that this is a serious weakness in Dillard's third proffered reason. *See Fuentes,* 32 F.3d at 765 ("[T]he non-moving party must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the ... proffered legitimate reasons, [that] a reasonable fact finder *could* rationally find them unworthy of credence . . . .")

Fakorzi admitted that Weigelt called the police, in part, because her check was declined by Equifax. *See* Plaintiffs' Response to Defendant Dillard's Statement of Undisputed Facts Supporting Summary Judgment, ¶ 61. Plaintiffs argue, however, that but for their race, Dillard's would have handled the declined check differently. Again, plaintiffs note that declined checks do not equate to criminal activity; and they reiterate the fact that Weigelt totally failed to consider that the problem stemmed from Dillard's $200.00 check writing policy, even after Fakorzi specifically brought the question to her attention.

The Court finds that a reasonable fact-finder could conclude that Dillard's proffered legitimate reasons are pretext, and

that Dillard's actions were motivated by racial prejudice. Dillard's motion for summary judgment on the § 1981 claim is denied.

#### ii. City Defendants

■ The Court next addresses plaintiffs' § 1981 claims against the city defendants. The Court finds plaintiffs failed to show that "the officers' actions were racially motivated by purposeful discrimination." *Buffkins v. City of Omaha,* 922 F.2d 465, 468 (8th Cir.1990) (holding that police officer's detention of suspected drug courier was not discriminatory where the suspected courier's race matched that of person described in a tip the officer had received). To the extent race was considered at all, it "was reasonable and non-discriminatory in light of the fact that [their] race matched the racial description of the [people] described in the tip" the officers received from Dillard's. *Id.See also, United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir. 1982) (police may detain a person for further investigation when, together with other relevant facts, the person's race matches the racial description of persons suspected of criminal activity). The Court grants the city defendants' motion for summary judgment on plaintiffs' § 1981 claims.

#### G. 42 U.S.C. § 1982

■ Plaintiffs filed § 1982 claims against all defendants similar to their § 1981 claims. Section 1982 states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. To state a prima facie case plaintiffs must allege that (1) they are members of a racial minority; (2) defendants denied rights or benefits connected with the ownership of property; and (3) defendants would not have denied these rights and benefits in the absence of racial discrimination. *See Zhu v. Countrywide Realty, Co., Inc.,* 160 F.Supp.2d 1210, 1232 (D.Kan.2001).

The first element is met, as both plaintiffs are minorities. Plaintiffs allege that all defendants prevented them from purchasing a dress by check. This satisfies the second element, as plaintiffs' right to purchase and convey property was affected. *See Dobson v. Central Carolina Bank and Trust Co.,* 2003 WL 165776, at *8 n. 5 ("Section 1982 is to be 'broadly construed' to protect citizens' rights to 'use [their] property'") (quoting *Memphis v. Greene,* 451 U.S. 100, 120, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981)). The Court's discussion about racial discrimination with respect to plaintiffs' § 1981 claims applies to their § 1982 claims. Therefore, the Court denies Dillard's motion for summary judgement on plaintiffs' § 1982 claim, but grants the city defendants' motion for summary judgment on this claim.

### III. CONCLUSION

The Court grants summary judgement in favor of Kron, DeBoer and Chief Bedford on plaintiffs' § 1983 claims. It denies the City of Coralville's motion for summary judgment on the § 1983 claim. The Court grants summary judgement in favor of all defendants on plaintiffs' false arrest/imprisonment claims. The Court denies the city defendants' motion for summary judgment on plaintiffs' assault and battery claims. The Court denies Dillard's motion for summary judgement on plaintiffs' § 1981 and § 1982 claims. However, the Court grants the city defendants' motion for summary judgment on these claims.

The Court will withhold ruling on plaintiffs' Iowa Constitutional claims until a hearing can be held. Judge Walters will

schedule a hearing on this matter at the March 14, 2003 final pre-trial conference.